UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

D-2 RAEF HAMAED, R.PH.,
D-3 TAREK FAKHURI, R.PH.,
D-4 KINDY GHUSSIN, R.PH., and
D-6 ALI ABDELRAZZAQ, R.PH.,

        Defendants.
_____/

Case No. 20-cr-20162
Honorable Linda V. Parker

## OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

On September 5, 2024, following a multi-week trial, a jury found Defendants Raef Hamaed, Tarek Fakhuri, Kindy Ghussin, and Ali Abdelrazzaq (collectively "Defendants") guilty of one count of conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. § 1349. The jury also found Fakhuri and Abdelrazzaq guilty of individual counts of health care fraud in violation of 18 U.S.C. §§ 1347 and 2.

Since the jury's verdict, Defendants have presented oral and/or written motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33. (See Text Entry 9/5/24; ECF Nos. 302-08.) Fakhuri also filed supplemental briefs in

support of his motions.  (*See* ECF No. 310-11.)  The Government filed a response

to Defendants' motions (ECF No. 313), and Fakhuri and Abdelrazzaq filed reply

briefs (ECF Nos. 314-16).  For the reasons below, the Court is denying the motions

filed by Hamed, Fakhuri, and Ghussin and is granting in part and denying in part

the motions filed by Abdelrazzaq.

## Applicable Standards

### Motion for Judgment of Acquittal Pursuant to Rule 29

The Sixth Circuit has described the standard for granting a Rule 29 motion

for judgment of acquittal as a "demanding" one, *United States v. Brooks*, 987 F.3d

593, 601 (6th Cir. 2021), which imposes a "very heavy burden" on the defendant,

*United States v. Robinson*, 99 F.4th 344, 354 (6th Cir. 2024) (quoting *United States

v. Emmons*, 8 F.4th 454, 478 (6th Cir. 2021)).  The defendant must show that "no

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  *Brooks*, 987 F.3d at 601 (citing *United States v. Maya*, 966

F.3d 493, 498 (6th Cir. 2020)).

When deciding a Rule 29 motion, the court "do[es] not weigh the evidence

presented, consider the credibility of witnesses, or substitute [its] judgment for that

of the jury."  *Robinson*, 99 F.4th at 353 (quoting *United States v. Jackson*, 470 F.3d

299, 309 (6th Cir. 2006)).  Instead, it "must 'draw all available inferences and

resolve all issues of credibility in favor of the jury's verdict.'"  *Id.* (quoting

2

*Jackson*, 470 F.3d at 309).  The evidence can be direct or circumstantial, and "need not remove every reasonable hypothesis except that of guilt."  *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (citations omitted); *see also Robinson*, 99 F.4th at 354 (quoting *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017)).

### Motion for New Trial Pursuant to Rule 33

Rule 33 grants trial courts the discretion to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The rule 'does not define interest of justice and the courts have had little success in trying to generalize its meaning.'"  *Robinson*, 99 F.4th at 367 (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)).  However, "several themes have emerged" from Sixth Circuit caselaw:

> The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that the jury's verdict was against the manifest weight of the evidence.  It is also widely agreed that Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred.

*Id.* (cleaned up).

With respect to the first scenario, the Sixth Circuit has advised that Rule 33 "authorizes a district court to order a new trial if the evidence weighs 'heavily against the verdict.'"  *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020) (quoting *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019)); *United*

*States v. Sears*, -- F.4th --, 2023 WL 395024, at *4 (6th Cir. 2023) (quoting *United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007)) (providing that Rule 33 "motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict'"). Before granting a Rule 33 motion under this scenario, however, the court must balance two "competing principles." *Burks*, 974 F.3d at 625. "On the one hand, it must scrutinize the record and ensure that a 'miscarriage of justice' did not occur." *Id.* (quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). "On the other hand, the court must respect the role of the jury and ensure that evidence-supported convictions are upheld." *Id.* (citing *Lutz*, 154 F.3d at 589).

The Sixth Circuit also has advised that trial courts should grant new trials "[o]nly in extraordinary circumstances," and "when the verdict exceeds the bounds of reasonableness[.]" *Burks*, 974 F.3d at 622 (citations omitted). "The verdict is not unreasonable simply because different inferences could have been drawn or because other results are more reasonable." *Id*. (brackets omitted) (quoting *United States v. Lyimo*, 574 F. App'x 667, 672 (6th Cir. 2014)). In comparison to a Rule 29 motion, however, the "district court may act as a thirteenth juror, weighing the evidence and deciding if the witnesses [were]e credible." *Sears*, 2023 WL 395024, at *4 (citing *United States v. Hughes*, 505 F.3d at 592-93); *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018) (citing *Hughes*, 505 F.3d at 593).

4

It is the defendant's burden to prove the need for a new trial, and the Sixth

Circuit has indicated that such motions "should be granted sparingly and with

caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993).

## Arguments & Analysis

### Sufficiency of the Evidence - Individual Health Care Fraud Counts

The Indictment charged Fakhuri and Abdelrazzaq, as well as their indicted

co-conspirator Hassan Abdallah, with individual counts of health care fraud in

violation of 18 U.S.C. § 1347 (Counts Two through Nine).  Specifically, Abdallah

was charged with three counts of health care fraud at Eastside Pharmacy, Inc.

(hereafter "Eastside") (Counts Two through Four). [1]  Fakhuri was charged with two

counts of health care fraud at Harper Drugs, Inc. (hereafter "Harper Drugs")

(Counts Five and Six).  Abdelrazzaq was charged with three counts of health care

fraud at Wayne Campus Pharmacy LLC (hereafter "Wayne Campus") (Counts

Seven through Nine).

After the close of the Government's case, the Court granted Fakhuri's

motion for judgment of acquittal as to Count Six.  The jury then found

Abdelrazzaq not guilty as to Count Nine, but found Fakhuri guilty of Count Five

---

[1] In exchange for Abdallah's guilty plea to Count One of the Indictment, charging
conspiracy to commit health care fraud, the Government dismissed the individual
health care fraud charges against him.  (*See* ECF No. 80.)

and Abdelrazzaq guilty of Counts Seven and Eight.  Abdelrazzaq has moved for

judgment of acquittal and a new trial with respect to the counts for which he was

found guilty.[2]

Counts Seven and Eight of the Indictment charge Abdelrazzaq with billing

Medicaid or Medicare for prescriptions filled at Wayne Campus for patients

Richard Weaver (Count Seven) and Michael Higgins (Count Eight) after they had

died.  There was sufficient evidence for the jury to conclude that the prescriptions

were filled and billed to Medicare or Medicaid after Weaver's and Higgins' deaths,

and not reversed.[3]  Abdelrazzaq argues, however, that the Government did not

---

[2] While Fakhuri mentions Count 5 in his initial motion for judgment of acquittal (*see* ECF No. 302), he presents no arguments in support of the motion.  Similarly, after the close of the Government's case, he brought a Rule 29 motion with respect to Count 5, but offered no arguments in support.  (ECF No. 279 at PageID. 4443.) Fakhuri mentions Count 5 again in his supplemental brief in support of his Rule 33 motion, but only with respect to his Confrontation Clause argument.  (*See* ECF No. 311 at PageID. 5464-66.)  In short, he has never argued that there was insufficient evidence to support his health care fraud conviction.  The Government asserts in its response brief that Fakhuri therefore has waived any request for relief with respect to this count.  (*See* ECF No. 313 at PageID. 5486.)  The Court agrees as to any sufficiency of the evidence argument.  *See United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) ("We require parties to develop their arguments in a non-perfunctory manner at the risk of having them deemed waived.").  The Court addresses the Confrontation Clause argument below.

[3] Reviewing the introduced Medicare claims data for Wayne Campus (Gov't Ex. 123A), FBI Special Agent Ian McDonald testified that the service date for Weaver's prescription (i.e., the date it was billed to insurance) was October 28, 2015.  (ECF No. 278 at PageID. 4205, 4209.)  According to Government Exhibit 1011, Weaver passed away on October 2, 2015.  (ECF No. 278 at PageID. 4204.) (cont'd)

present sufficient evidence for the jury to find *him* responsible for that fraudulent billing.

To find Abdelrazzaq guilty, the jury did not have to find that he filled the particular prescriptions for Weaver and Higgins. This is because the fraudulent conduct was the failure to reverse the claims submitted to Medicare and Medicaid when the prescriptions were not picked up by or for these patients. The Government asserts that there was sufficient evidence to show that Abdelrazzaq, as the pharmacist in charge ("PIC") at Wayne campus, was responsible for or exclusively handled reversing insurance charges for uncollected prescriptions.

The Government submits that the testimony of Express Scripts employee Blake Stockwell and former Harper Drugs pharmacy technician Rafi Rahman showed that the role of the PIC is to ensure the pharmacy operates in compliance with applicable rules and regulations, including reversing insurance charges when prescriptions are not picked up by patients. (*See* ECF No. 313 at PageID. 5488 (citing ECF No. 273 at PageID. 3811; ECF No. 279 at PageID. 4383).) To show the role of Abdelrazzaq at Wayne Campus, specifically, the Government points to

---

Reviewing the Medicaid claims data for Wayne Campus (Gov't Ex. 124), the service date for Higgins' prescription was January 9, 2016. (ECF No. 278 at PageID. 4203.) According to Government Exhibit 1010, Higgins passed away on December 23, 2015. (*See id.* at PageID. 4202.)

the testimony of Harold Jordan, a pharmacy technician who worked there from 2013-2020.  (*Id.* (citing ECF No. 273 at PageID. 3745-46).)

Stockwell testified to the requirements for pharmacies to comply with applicable rules and regulations and provided that the PIC "is kind of responsible for the day-to-day operations" and "mak[ing] sure things are happening appropriately."  (*See* ECF No. 273 at 3796, 3811.)  Rahman explained how reversals were handled specifically at Harper Drugs; and he provided that, when Fakhuri was working there, it was Fakhuri's responsibility, not the pharmacy technician's, to process reversals.  (*See* ECF No. 279 at PageID. 4385-86.)  Rahman did not testify to ever working at Wayne Campus or with Abdelrazzaq.  Thus, his testimony failed to show how or who handled the reversal process there.  Jordan was the only witness offered with respect to those issues.

Jordan's testimony did not establish that only Abdelrazzaq handled or was responsible for handling reversals at Wayne Campus, or that it was Abdelrazzaq who failed to reverse the Medicare or Medicaid billings charged in Counts Seven and Eight.  The Government focuses on Jordan's testimony concerning a "push cart" in the pharmacy, and Abdelrazzaq's indication "to leave it for him" (ECF No. 273 at PageID. 3745-46)—which the Government asserts were prescriptions placed on the push cart after patients had not timely picked them up.  However, that is not supported by the testimony.

During Jordan's direct examination, the Government asked him to explain the process for filling prescriptions.  (*Id.* at PageID. 3744.)  Jordan provided, in part, that once the pharmacy technician placed the medications in vials, the vials were placed on the pharmacist's desk for verification and then typically placed in alphabetized bins.  (*Id.*)  When asked if there were any prescriptions Abdelrazzaq did not place in the bins, the following exchange followed:

> A.  If -- yeah, if it was someone that he knew, I want to say, or he knows that they'll come at a certain time, he would put it to the side.
>
> Q. Okay. When you say he would put it to the side, is there any particular place he would put those prescriptions?
>
> A. On a basket, a silver basket, look [sic] like a push cart.
>
> Q. A silver basket, looks like a, I'm sorry, a what cart?
>
> A. A push cart.

(*Id.* at PageID. 3744-45.)  The Government then asked Jordan what happened to filled prescriptions that were not picked up by patients:

> A.  We did a return.
>
> Q.  Could you talk to us about how the return process works?
>
> A.  We go back to the computer and return -- go to the patient's profile and put return, and -- yeah, return it.  And then I think at the end of -- I can't remember all the way how it went, but we returned the medication and then at the end of the month, we probably returned everything that we didn't send out back to McKesson, but it went through the computer first.  When we did the returns, you know, we scratched off the patient name and put it back -- return to the shelves, the medication.

9

(*Id.* at PageID. 3745.)  Jordan never testified that those prescriptions were placed on the push cart.  And his testimony suggests that more than one person in the pharmacy processed returns.  In fact, on cross-examination, Jordan confirmed that Abdelrazzaq allowed him to reverse medications.  (*Id.* at PageID. 3754.)

There was no evidence that Abdelrazzaq was the only individual who handled reversals at Wayne Campus, or that he knew the prescriptions for Weaver and Higgins, which were filled after they had died, had not been reversed.  As the PIC at Wayne Campus, Abdelrazzaq may have been the individual ultimately responsible for ensuring that the charges were reversed in compliance with applicable rules and regulations.  But his abdication of that responsibility does not render him guilty of health care fraud.  As the Court instructed the jury, a violation of Medicare and/or Medicaid civil procedures, rules, or regulations is not a crime. (ECF No. 289 at PageID. 5129.)  As the Court further instructed, to find Abdelrazzaq guilty of the individual health care fraud charges, the jury had to find that he acted "knowingly and willfully[.]"  (ECF No. 289 at PageID. 5128.)

In short, there was insufficient evidence for the jury to find Abdelrazzaq guilty for Counts Seven and Eight.  The Court, therefore, is granting Abdelrazzaq's Rule 29 motion for judgment of acquittal with respect to Counts Seven and Eight.

**The Admission of the Prescription Drug Event ("PDE") Data
and Johanna Sullivan's Testimony**

Defendants maintain that their Sixth Amendment Confrontation Clause rights were violated when Johanna Sullivan was permitted to testify concerning inventory shortfalls at the subject pharmacies. Defendants argue that they were denied the opportunity to cross-examine the individuals who conducted the inventory shortage analyses and authored the reports of the analyses which were admitted into evidence. Defendants also argue that the PDE data on which the inventory shortage calculations were in part based constituted impermissible hearsay, which should not have been admitted into evidence under Federal Rules of Evidence 803(6) and 902(11).

As this Court ruled before trial, and again when hearsay objections were made at trial, the PDE data was admissible. (*See* ECF No. 242 at PageID. 1479-83; ECF No. 249 at PageID. 1970.) Defendants do not raise any new arguments to require a different outcome. Nor do they raise any new arguments with respect to Sullivan's testimony, which the Court also ruled was admissible.[4] (ECF No. 254 at PageID. 2065-67; ECF No. 286 at PageID. 4937.)

---

[4] During trial, Abdelrazzaq filed a motion for reconsideration with regards to this Court's ruling regarding Sullivan's testimony, which the Court denied on the record, indicating that a written opinion would follow. (ECF No. 286 at PageID. 4937.) The Court now realizes that its written decision was never filed, although it sees no purpose in filing it at this late juncture given the reasserted arguments (cont'd)

11

Sullivan's personal involvement with pulling the pharmacy data was not necessary for the Government to prove that it was what the Government claimed it to be, or for Sullivan to testify about her findings from that data.[5]  Sullivan testified without opposition as an expert, and an expert may base his or her opinion "on facts or data in the case that the expert has been made aware of or personally observed," Fed. R. Evid. 703, including "data [presented] to the expert outside of court and other than by his [or her] own perception[,] *id.* Advisory Committee's Note to 1972 Amendment.  Pursuant to Rule 703, the data need only be reliable.  Thus, Sullivan could permissibly rely on the data, even if pulled by others, provided the analysis and conclusions she provided in the courtroom were based on her personal review of the data.

Contrary to Defendants' assertions, Sullivan testified that she was personally involved in the invoice reviews that formed the basis for the loss calculations she testified to at trial.  (ECF No. 249 at PageID. 1998-99; ECF No. 254 at PageID. 2101.)  Sullivan provided that she assessed whether the data populated correctly in the "SAS program," confirmed that information from all the relevant wholesalers

concerning Sullivan's testimony in Defendants' pending motions.  In any event, the motion for reconsideration was denied because Abdelrazzaq failed to demonstrate a palpable defect in the Court's initial decision, for the reasons stated when denying the initial motion, and for the reasons set forth herein.

[5] Sullivan's testimony reflects, however, that she was very familiar with the source of the data and how it is collected and retrieved.  (*See* ECF No. 249 at PageID. 1948, 1958-61, 1963-64.)

were included, confirmed the appropriate date range was used for the records, and made sure the data was calculated correctly in the program.  (ECF No. 249 at PageID. 1991, 1998-99; ECF No. 254 at PageID. 2100-01.)  Sullivan's testimony is not rendered inadmissible simply because she did not manually perform the extensive calculations but relied on a reliable software program to do the job.  She created spreadsheet and invoice review summaries and charts and personally evaluated the data to reach the findings which she testified to at trial.  (ECF No. 249 at PageID. 2000-01.)  As a result, Sullivan's testimony is distinct from the witnesses whose testimony was excluded or found improperly admitted in the cases Defendants cite.  *See Smith v. Arizona*, 602 U.S. 779, 783 (2024) (finding a Confrontation Clause violation where the prosecution offered a substitute crime lab analyst to testify to an absent analyst's statements in support of the witness's opinion); *Bullcoming v. New Mexico*, 564 U.S. 647, 651-52 (2011) (holding that a crime lab analyst could not testify as to the "testimonial certification" of another analyst who tested the blood-alcohol level of an individual charged with drunk driving); *Auto Indus. Supplier ESOP v. Ford Motor Co.*, 435 F. App'x 430 (6th Cir. 2011) (excluding expert testimony where the witness's opinion was not based on sufficient facts and data because the expert had no familiarity with the underlying source documents); *Orthofix Inc. v. Lemanski*, No. 13-cv-11421, 2015 WL 12990115, at *2-3 (E.D. Mich. Sept. 29, 2015) (precluding testimony of

damages expert whose conclusions were based on "bad data" in that the plaintiff's

damages were overstated by approximately double, as the opinion was, therefore,

not reliable as required under Federal Rule of Evidence 702).

For these reasons, the Court finds that neither the Federal Rules of Evidence

nor the Confrontation Clause were violated as a result of the introduction of the

PDE data or Sullivan's testimony.

### Abdallah's Testimony

As a basis for his new trial motion, Hamaed argues that his conviction "rests

almost exclusively on the testimony of Abdallah, a questionable career criminal

witness who easily inserted himself into and manipulated the facts of the case to

secure substantial benefit." (ECF No. 307 at PageID. 5351.)  Hamaed asserts that

this constitutes substantial legal error.  (*Id.* at PageID. 5350 (citing *United States v.*

*Lewis*, 850 F. Supp. 2d 709, 762 (N.D. Ohio 2012).)

Abdallah's testimony, however, was not the exclusive or "almost

exclusive[]" basis for Hamaed's conviction.  Moreover, Hamaed offers no basis for

concluding that Abdallah is a "career criminal witness."  The fact that he pleaded

guilty and agreed to cooperate with the Government in this matter does not render

his testimony unreliable or its admission "substantial legal error."  *See id.* at 735

(observing that, while "the Government has the discretion to give resources and

immunity to a cooperating witness, . . . the use of such resources does not alone

14

render the witness's testimony incredible or constitutionally inadmissible"). If this were so, every criminal conviction based on the testimony of a cooperating co-defendant and/or co-conspirator would be overturned.

Hamaed offers no argument for why this Court should otherwise find Abdallah's testimony incredible, and this Court does not conclude that he lacked credibility. As such, his testimony is not comparable to the witnesses in *Lewis* "who were impeached" and "who collectively presented a narrative that was greatly undermined by competent and unimpeached evidence in the record[.]" 850 F. Supp. 2d at 762.

### Prejudicial Variance

Defendants argue that their convictions for conspiracy to commit health care fraud and wire fraud (Count One) must be set aside under Rule 29 or Rule 33 due to a prejudicial variance. The Indictment charged Defendants, along with Abdallah and co-conspirator Balhar Singh, with conspiracy to commit health care fraud and wire fraud by submitting and causing the submission of false and fraudulent claims to Medicare, Medicaid, and Blue Cross Blue Shield of Michigan ("BCBSM") through the five pharmacies with which one or more of the alleged co-conspirators were involved: Eastside Pharmacy, Inc. ("Eastside"), Harper Drugs, Heartland Pharmacy LLC ("Heartland"), Heartland Pharmacy 2, LLC ("Heartland 2"), and Wayne Campus. (*See* ECF No. 1.) Rather than proving a single conspiracy to

commit health care and/or wire fraud at the five pharmacies, Defendants maintain
that the evidence proved multiple independent conspiracies.

"A variance to the indictment occurs when the charging terms of the
indictment are unchanged, but the evidence at trial proves facts materially different
from those alleged in the indictment." *United States v. Solorio*, 337 F.3d 580, 589
(6th Cir. 2003) (brackets and emphasis omitted) (quoting *United States v.
Chilingirian*, 280 F.3d 704, 711 (6th Cir. 2002)). "A variance will not constitute
reversible error unless 'substantial rights' of the defendant have been affected[.]'"
*Id.* at 590 (quoting *Chilingirian*, 280 F.3d at 712). "[A] substantial right of the
defendant is violated by a variance 'only when a defendant proves prejudice to his
ability to defend himself or to the overall fairness of the trial.'" *Id.* (quoting *United
States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998)).

"Whether a single or multiple conspiracies have been shown is usually a
question of fact to be resolved by the jury" and must be considered "in the light
most favorable to the government." *United States v. Bailey*, 973 F.3d 548, 569
(6th Cir. 2020) (brackets omitted) (quoting *United States v. Smith*, 320 F.3d 647,
652 (6th Cir. 2003)). There are three main considerations when deciding how
many conspiracies are proven: "the existence of a common scheme, the nature of
the scheme, and the overlapping of the participants in various dealings." *Id.*
(quoting *Smith*, 320 F.3d at 652). "To prove a single conspiracy, the government

16

need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *Id*. (quoting *Smith*, 320 F.3d at 653).

With respect to the first consideration, the evidence revealed a common scheme to defraud Medicare, Medicaid, and BCBSM to increase the profits of the five pharmacies. Abdallah testified to his discussions with Defendants regarding their agreement to commit health care fraud. (*See, e.g.,* ECF No. 266 at PageID. 3230-31; ECF No. 262 at PageID. 3025-26; ECF No. 266 at PageID. 3180-81, 3228-29.) Khreizat and Singh also testified about the agreement. (ECF No. 246 at PageID. 1633, 1720; ECF No. 260 at PageID. 2687, 2696, 2707-08.)

As to the nature of the scheme, similar strategies and practices across the pharmacies were shown. Specifically, the evidence demonstrated that all five pharmacies billed for prescription medications that were not dispensed, including by failing to reverse claims for prescriptions not picked up by patients, and billed for brand name drugs when generic drugs were instead dispensed. The evidence also showed that similar methods were used to further the fraud, such as using the same tools to track prescriptions not dispensed, falsifying signature logs, and using incentives to encourage patients to continue using the subject pharmacies. In text messages, Defendants shared ideas and resources to accomplish and conceal their fraud.

Lastly, the participants significantly overlapped in various dealings. As the table below reflects, with the exception of Abdelrazzaq and Singh, each of the indicted co-conspirators held an ownership interest in several of the pharmacies. All of the individuals charged in the Indictment, except Singh, held an ownership interest in Wayne Campus.

|  | Eastside | Harper | Heartland | Heartland 2 | Wayne Campus |
|---|---|---|---|---|---|
| Abdallah | x | x | x | x | x |
| Singh |  |  |  | x |  |
| Hamaed | x | x | x | x | x |
| Fakhuri[6] |  | x | x |  | x |
| Ghussin |  |  | x | x | x |
| Abdelrazzaq |  |  |  |  | x |

Further, Abdallah and Hamaed were classmates in pharmacy school. Hamaed then brought in Fakhuri, his former intern. Fakhuri then brought in Ghussin, his former classmate in pharmacy school and former roommate, and Abdelrazzaq.

The existence of a single conspiracy is not undercut by the fact that all of the charged conspirators did not have an ownership interest in or role at all five pharmacies. "A single conspiracy is not converted to multiple conspiracies simply because it can be subdivided, or because there are changes in the individuals involved or the roles that they play in the conspiracy." *United States v. Walls*, 293 F.3d 959, 968 (6th Cir. 2002) (citing *United States v. Wilson*, 168 F.3d 916, 924

---

[6] Fakhuri concealed his ownership in Harper Drugs, Wayne Campus, and Heartland through his wife.

(6th Cir. 1999); *United States v. Rugiero*, 20 F.3d 1387, 1391-92 (6th Cir. 1994)).
"The mere fact that a conspiracy can be subdivided . . . does not mean that multiple
conspiracies existed." *United States v. Wilson*, 168 F.3d 916, 924 (citing *Rugiero*,
20 F.3d at 1392). "As long as the different sub-groups are committing acts in
furtherance of one overall plan, the jury can still find a single, continuing
conspiracy." *Id.* (citations omitted).

Moreover, each defendant does not need to be involved in every aspect of
the conspiracy to find a single conspiracy. "[A] single conspiracy is not converted
into multiple conspiracies merely because there may be some changes in persons
involved or because they play different roles." *Rugiero*, 20 F.3d at 1391 (citing
*United States v. Rios*, 842 F.2d 868, 872 (6th Cir. 1988), *cert. denied*, 488 U.S.
1031 (1989); *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979)). "Each
member of the conspiracy need not be shown to know each other or to have direct
association with all other conspirators." *Id.* (citing *United States v. Sanchez*, 928
F.2d 1450, 1457 (6th Cir. 1991)). "A [t]acit or mutual understanding [of the
conspiracy] and active participation by a defendant in some act or portion of the
conspiracy is all that is required." *Id.* at 1391-92 (citing *United States v. Lee*, 991
F.2d 343, 347-48 (6th Cir. 1993)).

For these reasons, the evidence presented at Defendants' trial cannot
reasonably be construed as *only* supporting a finding of multiple conspiracies. *See*

*Walls*, 293 F.3d at 967 (citing *Lee*, 991 F.2d at 349) (explaining that a variance occurs if "the evidence can be construed as only supporting a finding of multiple conspiracies").  The Court, therefore, declines to interfere with the jury's resolution of this factual question.  Moreover, the Sixth Circuit has "repeatedly held that, 'if the government proves multiple conspiracies *and a defendant's involvement in at least one of them*, then clearly there is no variance affecting that defendant's substantial rights.'"  *United States v. Matthews*, 31 F.4th 436, 455-56 (6th Cir. 2022) (quoting *United States v. Robinson*, 547 F.3d 632-642-43 (6th Cir. 2008)); *see also United States v. English*, 785 F.3d 1052, 1057 (6th Cir. 2015) (same).

## Conclusion

For the reasons stated, the Court concludes that there was sufficient evidence presented at trial to support Defendants' convictions for conspiracy to commit health care fraud (Count One) and Fakhuri's conviction for health care fraud (Count Five).  The interest of justice does not warrant a new trial with regard to those convictions.  However, there was insufficient evidence to support Abdelrazzaq's convictions for the health care fraud charged in Counts Seven and Eight of the Indictment.

Accordingly,

**IT IS ORDERED** that Hamaed's, Fakhuri's, and Ghussin's motions for judgment of acquittal and/or for new trial (ECF Nos. 302, 303, 305, & 307) are **DENIED**.

**IT IS FURTHER ORDERED** that Abdelrazzaq's motions for judgment of acquittal and/or for new trial (ECF Nos. 306, 308) are **GRANTED IN PART AND DENIED IN PART** in that his convictions for health care fraud (Counts Seven and Eight), only, are **VACATED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 19, 2024

21